# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE:<br><br>Dean Randall Bozard,<br><br>                                            Debtor. | C/A No. 17-03344-DD<br><br>Chapter 7<br><br>**ORDER** |

This matter is before the Court on a Motion to Dismiss filed by the United States Trustee on November 2, 2017 [Docket No. 28]. Debtor Dean Randall Bozard ("Debtor") filed a response to the Motion on November 22, 2017 [Docket No. 30]. A hearing was held on May 8, 2018. At the conclusion of the hearing the Court took the matter under advisement and now issues this Order.

## BACKGROUND

1. Debtor filed a voluntary petition for relief pursuant to chapter 7 of the Bankruptcy Code on July 6, 2017, initiating the present bankruptcy case. Debtor is married and lists no dependents.

2. Debtor filed schedules and statements on July 6, 2017. Debtor's obligations are primarily consumer debts. The chapter 7 means test reflects that Debtor has above-median household income, but the presumption of abuse does not arise in this case. The time to file § 707(b) motions to dismiss was extended with the consent of Debtor.

3. Debtor filed a reaffirmation agreement for a debt secured by a 2015 Jeep Cherokee on July 31, 2017. Debtor filed a reaffirmation agreement for a debt secured by a 2014 Harley Davidson on July 31, 2017. Debtor filed a reaffirmation agreement for a debt secured by a 2006 Dodge Dakota on August 4, 2017.

4. On August 4, 2017, following the meeting of creditors, Debtor amended schedule J to remove two vehicle payments, the payments on the 2014 Harley Davidson and a 2006 Dodge Dakota, resulting in net monthly income of negative $37. Debtor also amended the statement of intent to surrender a 2014 Harley Davidson and filed a rescission of the reaffirmation agreement regarding the Harley Davidson. Debtor did not seek to rescind the other two reaffirmation agreements.

5. Debtor's Amended Schedule I, filed February 22, 2018, reflects that Debtor has monthly income of $4,162.06 with his non-filing wife having monthly income of $2,764.80. Thus, Amended Schedule I reflects that Debtor's annual household income is $83,122.32.

6. Schedule F reflects Debtor has unsecured creditors with claims in the amount of $74,322.29, of which $9,407 is owed to medical providers, $21,635 is an unsecured deficiency on a surrendered vehicle, and the remaining $43,280 arises from credit cards and unsecured loans or lines of credit.

7. Debtor drives a 2017 Chevrolet Camaro, titled in his non-filing wife's name, with payments of $489.23. Debtor's wife drives a 2015 Jeep Cherokee, titled in Debtor's name, with payments of $552.62. Original Schedule J also included payments of $294.31 for a Harley Davidson that was later surrendered, and $226.27 for the 2006 Dodge Dakota driven by Debtor's 29-year old son. Debtor testified that his son now makes the payment on the Dodge Dakota.

8. Debtor testified he has a ninth grade education, and has worked in manufacturing and maintenance since he was nineteen years old.

9. Debtor testified that his financial problems began when he took a significant pay cut as a result of a job change. Debtor testified that prior to his current job he worked at Bimbo

2

Bakeries in Orangeburg, South Carolina. Debtor testified he made approximately $5,600 per month at Bimbo. Debtor testified he was "forced out" at Bimbo and quit. Debtor began working at Akebono Brake in Columbia, South Carolina in October 2017, making $4,065 per month. Debtor testified he made approximately $4,600 per month at the time of filing, including overtime pay.

10. Debtor testified his reduction in income from changing jobs put a strain on his financial situation, and his financial problems increased when his overtime hours at work were cut.

11. Debtor had surgery on his right hand in February 2018 and has not been able to return to work. Debtor testified that he currently receives disability income from a private insurer in the amount of approximately 60% of his income.

12. Debtor testified he has numerous health problems. Debtor has arthritis in his hands, which required surgery to implant prostheses in February 2018. Debtor has not been able to work since he had surgery. Debtor testified he has diabetes that have caused his kidneys to only work at 43%, problems with circulation to his feet, and other circulatory problems in his legs. Debtor testified he takes nine pills per day and insulin for his diabetes. Debtor testified he has torn cartilage in his knee, that surgery is needed on his knee, but that he does not have sufficient leave time from work to permit surgery.

13. Debtor's original Schedule J listed $401.96 per month for medical expenses. Debtor's amended Schedule J listed $752.61 per month for medical expenses.

14. Debtor testified that he hopes to return to work and work for three-more years.

15. Debtor testified he was current on all payments at the time of filing.

16. Mrs. Bozard testified that she handles the finances for both herself and Debtor, but uses Debtor's money to pay his debts. Mrs. Bozard and Debtor maintain separate bank

accounts. Mrs. Bozard remarked that Debtor historically has not understood the impact of as yet unpaid monthly bills and not-yet cleared checks on the available funds balance in his account and will spend money earmarked for bills before the bills can be paid or the checks can clear. She sometimes moves money from his account to hers to avoid this.

**Pre-Petition Events**

17. Debtor and his wife reside in a home given to Mrs. Bozard by her mother. There is no mortgage on the home. Debtor and his wife have lived at the home for 21 years. Debtor did not list the residence in his schedules, neither an ownership interest nor an equitable interest. Debtor testified that he does not believe he has an equitable interest in the home.

18. At the time of the bankruptcy filing, Debtor and his wife had multiple vehicles: a 2015 Jeep Cherokee, a 2014 Harley Davidson, a 2017 Chevrolet Camaro, and a 1965 Ford Falcon. Debtor testified the 1965 Ford Falcon has been inoperable for approximately nine years, and was given to his wife after her father passed away. Their son, Alex Bozard, drove a 2006 Dodge Dakota titled jointly to Debtor and Mrs. Bozard and financed by a loan for which they are jointly liable.

19. Prior to the bankruptcy filing, Debtor and Mrs. Bozard made the payments on the Dodge Dakota. Alex Bozard began making the full payment of $226.27 for the Dodge Dakota starting in July 2017.

20. Debtor purchased a 2006 Harley Davidson in January 2017. Debtor sold the 2006 Harley Davidson in April 2017. The 2006 Harley Davidson was encumbered by a lien of $5,550, which was paid off with the proceeds from the sale of the motorcycle.

21. Debtor traded-in a 2016 Dodge Ram, and purchased a 2016 Dodge Charger in December 2016. Debtor testified he traded in the Dodge Ram in an attempt to lower his car

4

payment and get a vehicle with better fuel mileage. Debtor surrendered the 2016 Dodge Charger in May 2017, resulting in an unsecured deficiency claim. Debtor testified that he surrendered the Charger because he was upside down on the loan and he wanted a lower payment.

22. Debtor purchased a 2014 Harley Davidson in March 2017. Debtor purchased the 2017 Chevrolet Camaro in April 2017. The Chevrolet Camaro was purchased and titled in Mrs. Bozard's name because Debtor could not get financing.

23. In February 2017, Debtor negotiated an agreement with South State Bank, the creditor holding Debtor's largest credit card debt. The agreement lowered Debtor's monthly payment and interest rate and revoked his ability to make new charges on the account.

24. Prior to the bankruptcy filing, Debtor sold multiple assets, including the 2006 Harley Davidson. Between March 2017 and June 2017 Debtor sold 34 guns for approximately $10,000. Debtor testified that after filing he attempted to replace some of the guns while he was receiving overtime at work.

25. In item 18 of the Statement of Financial Affairs Debtor disclosed he received $17,540 for assets sold between March and June 2017. $5,550 of the sale proceeds was used to pay the lien on the 2006 Harley Davidson. Debtor testified that the remaining sale proceeds had been exhausted by the time of the bankruptcy filing. Debtor testified he used the remaining proceeds to pay for personal expenses, including regular monthly payments on vehicles and monthly payments to South State Bank under a restructured payment agreement on a credit card.

26. In June 2017, the month before filing, Debtor upgraded musical equipment at Guitar Center. Debtor's bank records indicate purchases of approximately $400 at Guitar Center

in June 2017. Debtor testified that he upgraded his equipment to join a band, in hopes of making additional money. This did not happen.

**Post-Petition Events**

27. Mrs. Bozard testified that she used her Wells Fargo credit card to purchase an air conditioning and heating unit for her son's home for approximately $5,000. Mrs. Bozard testified that she pays approximately $80 per month on this debt.

28. During the period of July 31 through December 4, 2017, Debtor spent $2,460.48 at Phillips Sporting Goods purchasing ten firearms, including one that he had sold to Phillips Sporting Goods prior to the bankruptcy filing, a holster and ammunition.

29. On November 21, 2017, Debtor amended Schedule B and the Statement of Affairs to add a Bioventus Exogen Ultrasonic therapy unit and Debtor's possession of a 2017 Chevrolet Camaro.

30. The parties stipulated that Debtor provided information requested by the United States Trustee voluntarily and in a timely manner.

## ANALYSIS

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, 119 Stat. 23 (codified in scattered sections of Title 11 of the U.S.Code) ("2005 Amendments") made significant changes to the Bankruptcy Code. Among the more significant of these changes was the revision of § 707(b). A chapter 7 case filed by an individual debtor may be dismissed, or with the debtor's consent converted, if relief would be an abuse of the provisions of chapter 7 of the Bankruptcy Code. Abuse of the Bankruptcy Code occurs under § 707(b) when "a debtor attempts to use the provision of the Code to get a 'head start' rather than a 'fresh start.'" *In re Hornung,* 425 B.R. 242, 247 (Bankr. M.D.N.C. 2010) (citing *Green v. Staples (In re*

*Green)*, 934 F.2d 568, 570 (4th Cir. 1991). The UST requests that Debtor's case be dismissed pursuant to 11 U.S.C. § 707(b)(1) and (3), based on bad faith, and the totality of the circumstances.

Abuse is presumed, for above median income debtors, if the application of a statutory "means test" yields available funds for payment to creditors of a specified dividend. § 707(b)(2)(A). A presumption of abuse may be rebutted. § 707(b)(2)(B). Abuse may also be shown by proof of the bad faith filing of the bankruptcy petition or by demonstration of abuse in light of the totality of the circumstances of the debtor's financial situation. § 707(b)(3). In this case the UST does not argue a presumption of abuse arising from the application of the means test. Rather, the UST argues abuse based on the totality of the circumstances and bad faith in filing the bankruptcy petition. In relevant portion the Bankruptcy Code provides:

> (b)(1) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts… if it finds that the granting of relief would be an abuse of the provisions of this chapter…
>
> (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider—
>
> (A) whether the debtor filed the petition in bad faith; or
>
> (B) the totality of the circumstance…of the debtor's financial situation demonstrates abuse.

§ 707(b)(1), (3).

Section 707(b)(3) provides that a court may still dismiss a case based upon the particular circumstances of the case, even if a presumption of abuse does not arise. The UST does not assert that a presumption of abuse arises in this case, so the Court need only address § 707(b)(3). Unlike before the 2005 Amendments, § 707(b)(3) does not require a showing of "substantial abuse," but a lower standard of "abuse." The UST alleges that the granting of relief would be an abuse under both the bad faith and totality of the circumstances prongs.

### A. Bad Faith under Section 707(b)(3)(A)

A "bad faith filing" is defined as a "bankruptcy petition that is inconsistent with the purposes of the Bankruptcy Code." Black's Law Dictionary 166 (10th Ed. 2014). Bad faith may involve a dishonest debtor or nefarious acts, but such motivation or intent is not necessary. Bad faith exists if the filing of the bankruptcy was for a purpose not consistent with the Bankruptcy Code or policy even though the purpose may otherwise be lawful." *In re Hageney*, 422 B.R. 254, 259–60 (Bankr.E.D.Wash.2009). In assessing whether a debtor filed the bankruptcy petition in bad faith, factors unrelated to the debtor's financial situation may be reviewed, such as eve-of-bankruptcy purchases, filing incomplete or false schedules, or failure to cooperate with the bankruptcy trustee. *In re Hornung*, 425 B.R. at 249.

1. **Eve-of-Bankruptcy Purchases**

Debtor filed his voluntary petition on July 6, 2017. The UST argues Debtor and his non-filing spouse incurred significant debt in the four-months before the bankruptcy filing. Debtor purchased a 2006 Harley Davidson in January 2017, but later sold the 2006 Harley Davidson in April 2017. Debtor incurred $16,059.00 purchasing a 2014 Harley Davidson in March 2017. Debtor filed a reaffirmation agreement on the 2014 Harley Davidson, but later rescinded the

8

reaffirmation agreement and surrendered the motorcycle. Debtor, through his spouse, purchased a 2017 Chevrolet Camaro in April 2017. Debtor surrendered a 2016 Dodge Charger in May 2017, resulting in an unsecured deficiency in excess of $20,000.

Debtor testified that he continued to trade-in vehicles in an effort to reduce his car payment and to find a vehicle with better gas mileage. Debtor testified that he traded in a Dodge Ram truck for the Dodge Charger in hopes of reducing his car payments, but his payment was not lowered as he expected. He testified that led to him surrendering the Dodge Charger. Debtor testified he purchased the Chevrolet Camaro because it reduced his car payment significantly and the Camaro got significantly better gas mileage than the Dodge Charger. Debtor testified the Camaro was financed by and titled in Mrs. Bozard's name because Debtor was unable to secure financing. The Court finds Debtor was attempting to reduce his car payment and improve his gas mileage by purchasing the Chevrolet Camaro, not to manipulate the Bankruptcy Code. In fact, the transactions resulted in a reduction of payments from over $700 per month to less than $500 per month.

Debtor purchased the 2006 Harley Davidson and later sold it. While Debtor did testify that he may have lost "a little bit of money" on the sale, the Court is not persuaded that the purchase and later sale was done in an attempt to later abuse the Bankruptcy Code. The debt was paid in full and is more in line with Debtor's history of poor financial decisions than abuse. While Debtor's purchase of the 2014 Harley Davison is more troubling, Debtor did later surrender the motorcycle. While not a wise financial decision, the purchase occurred at the time Debtor was seeking to improve gas mileage for a vehicle used in his long commute to work.

9

Debtor testified that he upgraded his musical equipment to new equipment because of the requirements of the band he was joining. Debtor testified that he joined the band in hopes of making additional income. His hopes of making money did not come to fruition.

While Debtor did make numerous expensive purchases leading up to the bankruptcy filing, Debtor also sold over $17,000 in assets. Debtor testified he depleted those funds paying for ordinary expenses, but did not pay down debts to his unsecured creditors because he was current on all payments to those creditors. Essentially Debtor also used some of the sale proceeds to buy other assets and maintain minimum payments, making no headway but getting no further behind.

Notably, Debtor did not significantly increase his revolving unsecured debt in the period leading up to the filing of this case. Debtor testified that the bulk of the unsecured debt was accumulated in 2015-2016 when his income was higher and his travel for work was less. Debtor actually attempted to get a handle on his largest unsecured debt in February 2017 by entering into the agreement with South State Bank.

The Court is not persuaded that Debtor's behavior leading up to the bankruptcy, while certainly not fiscally responsible or prudent, was an attempt to later use the bankruptcy to get a head start instead of a fresh start.

2. **Incomplete and Inaccurate Schedules**

In addition to the eve-of-bankruptcy purchases, the UST argues that Debtor's schedules contain numerous inaccuracies. In Debtor's original Schedule J and in the means test, Debtor included payments on the 2006 Dodge Dakota. Debtor later amended his Schedule J to remove the payment on the Dodge Dakota, and testified that his son started making those payments at the time the bankruptcy case was filed.

The UST also argues that Debtor's Schedule J appears to include expenses that are inconsistent with Debtor and his non-filing spouse's bank accounts. The UST argues the bank statements do not reflect health care expenses of $401 per month, and certainly not the $752, to which the amount was later amended. As discussed above, both Debtor and his wife have health problems. Debtor testified regarding his diabetes, the issues that has caused him, and the vast efforts he must take to control his diabetes. Debtor's wife testified that she also has diabetes, and an eye condition that requires very expensive injections into her eye once a month. While the bank statements may not confirm actual payments of $752 per month in health expenses, the Court is satisfied by the testimony of Debtor and his wife that the monthly household medical expenses incurred are at least $752.

At the hearing, the UST argued that Debtor failed to disclose an equitable interest in the residence in his schedules, and failed to disclose the 2017 Chevrolet Camaro in his schedules or at the meeting of creditors until specifically asked about it. Debtor testified at the hearing that he does not believe he has an equitable interest in the home, because it was given to his wife from her mother after her father passed. Debtor testified he did not disclose the Chevrolet Camaro in his schedules because the car is titled in his wife's name. While the Court recognizes the importance of complete disclosure by debtors, the Court is not convinced Debtor acted with an intent to mislead the Court and other parties in interest. The schedules and statements, including the listing of assets disposed of prior to filing, are actually quite thorough.

B. **Totality of the Circumstances**

This Court has held that pre-2005 Amendment cases, such as *Green*, remain instructive in an analysis pursuant to new § 707(b)(3). *See In re Calhoun*, 396 B.R. 270 (Bankr. D.S.C. 2008), *In re Wolf*, 390 B.R. 825 (Bankr. D.S.C. 2008). Under *Green*, a court is to determine whether to

dismiss a case for abuse of chapter 7 by considering the totality of the circumstances. *In re Green*, 934 F.2d at 572. The Fourth Circuit held that in considering the totality of the circumstances, a court should consider the debtor's ability to repay his debts, in addition to consideration of:

 (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability or unemployment;

 (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

 (3) Whether the debtor's family budget is excessive or unreasonable;

 (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and

 (5) Whether the petition was filed in good faith.

*Id.* The court in *Green* indicated that, "the debtor's ability to repay is the *primary* factor to be considered (emphasis in the original)." *Id.*

In Wolf the Court considered the issue of bad faith and noted, "[a] debtor's good faith in filing a petition, a *Green* totality of the circumstances factor, is now a separate basis for a finding of abuse." *In re Wolf*, 390 B.R. at 833. Additionally, the Fourth Circuit has recognized the continuing validity of the *Green* factors. *See Calhoun v. U.S. Trustee*, 650 F.3d 338 (4th Cir. 2011).

 1. **Sudden Illness, Calamity, Disability, or Unemployment**

 While Debtor did not have a sudden illness, disability or unemployment the dominos have been falling for a while and this suggests not abuse but, at best, the failure to adjust to less prosperous times and a more dismal future. Debtor testified regarding his serious medical issues.

12

He is currently 59-years old and hopes to work until he is 62-years old, when he hopes to take an early retirement. Based on the health issues he testified about and as noted below, the Court is not convinced he will be able to work until 62-years old. Debtor's health has gradually gotten worse, and from his testimony it is not likely to improve.

Further, Debtor's income has gradually decreased. At Debtor's previous employment he earned approximately $5,600 per month. When he began his current job his income was reduced to approximately $4,065 per month, and reached a peak of $4,500 per month but has fallen back to $4,162. Debtor testified that he previously relied on overtime pay to supplement his income to afford his expenses, but a new manager reduced and possibly eliminated the potential for overtime. Debtor testified that he had surgery on his hand in February 2018, and has been receiving approximately 60% of his previous income from a private disability policy, receiving $562.39 per week. Debtor has not yet returned to work, and the Court is not persuaded he will be able to return to work anytime soon.

Debtor testified that his long-term health problems and job changes caused him to file this bankruptcy case, and his employment and health have further declined since filing. While Debtor did not experience a sudden illness or loss of employment, he has experienced a significant income loss and has serious long-term health issues. These factors, and not abuse, seem to precipitate the filing.

2. **Cash Advances and Consumer Purchases in Excess of Ability to Repay**

"A debtor's ability to repay consumer purchases and cash advances should be interpreted in a manner consistent with a debtor's reasonable expectations of repayment at the time that the debt was incurred." *In re Hornung*, 425 B.R. at 254 (citing *In re Beitzel*, 333 B.R. 84, 91 (Bankr. M.D.N.C. 2005)). Debtor testified that he has remained current on all debt payments. He

testified that the bulk of his unsecured credit card debt was incurred in 2015 to 2016, when his income was substantially higher. Further, Debtor reached an agreement with the holder of his largest credit card debt that removed his ability to incur additional debt. The Court finds Debtor did not make excessive consumer purchases at a time when he did not have the ability to repay or a reasonable expectation of repayment. Debtor maintained a lifestyle of living paycheck to paycheck. When Debtor was current on all of his payments and received additional income from overtime, he spent the money. While not wise, this is simply a reflection of Debtor's historical financial practice, not abuse. Like many debtors, the expenditures consumed all available income, yet if living from paycheck to paycheck was conclusive of fraud there would be few bankruptcy filings. Like Debtor's asset sales, purchases and trades, the pattern is not of abuse but poor decision making that keeps Debtor and his family from getting ahead.

3. **Excessive or Unreasonable Family Budget**

The UST argues Debtor's family budget is excessive because Debtor and his wife reflect car payments in excess of $1,500 for multiple vehicles, car insurance of more than $3,600 per year, and personal property taxes of $1,005. The UST argues the Debtor and his wife's food and meals away from home, health care expenses, and the non-filing spouse's debt payments are all excessive. The UST argues Debtor's household budget could be reduced without depriving the household of adequate food, clothing, shelter, and other necessities.

Debtor's Amended Schedule J shows car payments of $1,042, $385 in meals away from home, $753 in medical expenses, and Debtor's wife's debt payments of $1,044.50. Since filing, Debtor has reduced his monthly budget by surrendering the 2014 Harley Davidson, and his son taking over payments on the 2006 Dodge Dakota. Prior to filing, Debtor continued to trade-in more expensive vehicles in hopes of reducing his monthly payment. He finally succeeded in

14

this. Based on Debtor and his wife's testimony at the hearing, the Court does not find the medical expenses included in the household budget excessive or unreasonable. The medical expenses may not be paid on a current basis but they will continue and on-going medical expenses must be paid at some point. Reviewing all the evidence and testimony, the Court concludes Debtor's budget is not excessive or unreasonable. True, the budget could be different but, even with the reductions made since filing, there is not an excess available to pay creditors and Debtor's deteriorating medical condition makes any possibility of repayment unlikely.

4. **Accuracy of Schedules**

As discussed above, the Court recognizes the importance of complete disclosure by debtors, but the Court is not convinced Debtor acted with an intent to mislead the Court and other parties in interest when filing his schedules. Most of the disclosures are complete and the few omissions relate mostly to vehicle ownership, titling, and a dispute as to whether Debtor has an equitable interest in the home absent domestic litigation.

5. **Ability to Repay**

"An appropriate method of evaluating whether a debtor has the ability to repay his or her debts is to determine what amount of that indebtedness could be repaid in a hypothetical Chapter 13 plan." *In re Hornung*, 425 B.R. at 251. "[C]onsideration of post-petition changes in the financial circumstances of the debtor [is] appropriate when determining if the debtor has the ability to pay in a hypothetical Chapter 13 plan because the inquiry requires analysis of a debtor's actual ability pay." *Id.* at 252. "[P]ost-petition changes to a debtor's income and expenses are relevant to the determination of whether a debtor has the ability to repay creditors in a hypothetical Chapter 13 plan." *Id.* at 252-53.

The UST argues Debtor has sufficient income from which he should be able to repay a significant amount of his debt owed.  The UST points out that Debtor and his non-filing spouse initially listed an annual household income of $85,000, substantially more than the median family income for a household of two in South Carolina.  Debtor was making substantial monthly payments on multiple vehicles and plans to continue doing so after his bankruptcy.

Since filing, Debtor has surrendered a 2014 Harley Davidson, reducing his monthly vehicle payment by $294.  Further, Debtor's son is now making the monthly payment on the 2006 Dodge Dakota.  Despite these reductions in vehicle expenses, Debtor's most recent amended Schedule J shows a net income of negative $957.  Debtor's amended Schedule I shows a reduction in income since the time of filing.  Debtor testified that he had hand surgery in February 2018 and his income has decreased even further since surgery because he has been unable to return to work.  Debtor filed a Motion to Supplement the Record on May 10, 2018 with a note from his doctor, indicating that Debtor will not be able to return to work until at least June 6, 2018.  Debtor testified at the hearing that if he was unable to return to work on the week of May 21, 2018 he would likely be fired.  In that event, there is not and will not be funds to pay creditors.  Reasonable belt tightening would not resolve the $957 deficit and if Debtor's job is lost the situation will be even worse.  At the moment, and perhaps for some time to come, Debtor has only the disability income.

A typical chapter 13 plan provides for payments over a period of five years.  Debtor testified at the hearing that because of his extensive health issue he hopes to work for another three years, but is unsure if he will be able to even work that long.  Based on Debtor's testimony and extensive health issues, the Court is not convinced that Debtor could adequately fund a

hypothetical chapter 13 plan. Further, Debtor's continued reduction in income decreases the likelihood Debtor could fund a hypothetical chapter 13 plan.

6. **Good Faith**

"The *Green* factor of good faith requires a court to look to the totality of the circumstances of the debtor's financial situation." *In re Hornung*, 425 B.R. at 255. The Court concludes that Debtor did not live beyond his means up to the time of the bankruptcy, and this fact weighs in favor of finding of good faith. Debtor attempted to reduce his car payment, negotiated a reduced credit card payment and interest rate while giving up his ability to make new charges on his major credit card, and sold numerous assets in an attempt to pay living expenses bills. He was current with bills, though not making any real progress, at the time the petition was filed. Further, Debtor cooperated voluntarily and timely with the UST's substantial request for documents. The Court finds that these circumstances demonstrate that the petition was filed in good faith.

## CONCLUSION

The standard for granting a motion to dismiss pursuant to § 707(b)(3) is no longer "substantial abuse," but rather just "abuse." The UST alleges that the granting of relief would be an abuse under both the bad faith and the totality of the circumstances of §707(b)(3). The Court finds that allowing Debtor to continue in a chapter 7 case would not constitute abuse of the Bankruptcy Code within the meaning of § 707(b)(3), under either prong. The Court recognizes that this is a case that the UST properly challenged, so many facts in this case, on their face, give rise to suspicion of fraud or abuse. Only after assessing Debtor's story, it is apparent the facts paint a picture of poor decision making, not abuse. While Debtor made many questionable financial decisions prior to filing bankruptcy, and after filing bankruptcy, the Court finds that

17

these actions were not made in bad faith or with contemplation of abusing the Bankruptcy Code. On balance the preponderance of the evidence is ever so slightly with the Debtor. The UST's Motion to Dismiss is denied.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT
05/18/2018**



David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina

Entered: 05/18/2018